**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**TAMMY MICHELLE RANDALL,**

        **Plaintiff,**

    **v.**
                               **Civil Action 2:17-cv-785**
                               **Judge Algenon L. Marbley**
                               **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Tammy Michelle Randall, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her Title II Social Security Disability Benefits and Title XVI Supplemental Security Income Disability applications. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 7) be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I.  BACKGROUND**

    **A.  Prior Proceedings**

Plaintiff filed applications for Title XVI Supplemental Security Disability Benefits and Title II Social Security Disability Benefits on January 31, 2014, and May 6, 2014, respectively. (*See* Doc. 7-3, Tr. 72–73, 87-88, PAGEID #: 112–13, 126–27). In both applications, Plaintiff alleged disability since October 30, 2013. (*Id.*). After Plaintiff's applications were denied initially and on reconsideration (Doc. 7-4, Tr. 140–42, 148–49, PAGEID #: 181–83, 189–90), Plaintiff requested a hearing before an Administrative Law Judge (*id.*, Tr. 150, PAGEID #: 191).

Administrative Law Judge Bonnie Hannan (the "ALJ") held a video hearing on March 30, 2016. (Doc. 6-2, Tr. 36–70, PAGEID #: 75–109). On May 8, 2017, the ALJ issued a

decision finding that Plaintiff was not disabled as defined in the Social Security Act. (*Id.*, Tr. 12–28, PAGEID #: 51–67). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, Tr. 1, PAGEID #: 40).

Plaintiff filed this case on September 5, 2017 (Doc. 1), and the Commissioner filed the administrative record on December 15, 2017 (Doc. 6). Plaintiff filed a Statement of Specific Errors (Doc. 7), the Commissioner responded (Doc. 8), and Plaintiff filed a Reply (Doc. 9).

## B. Relevant Testimony at the Administrative Hearing

### *1. Plaintiff's Testimony*

Plaintiff testified that she lived in Maryland with her daughter and three grandchildren, ages four, seven, and nine, until March 2016. (*Id.*, Tr. 40, 42, PAGEID #: 79, 81). During that time, Plaintiff stated that her daughter "was never home" so she was the primary caretaker of the three children. (*Id.*). In March 2016, Plaintiff's daughter moved to Ohio, and Plaintiff followed in October 2016. (*Id.*). Although Plaintiff stated that she is no longer the primary caretaker of all three grandchildren, she is responsible for watching her four-year-old grandson during the day, feeding her grandson breakfast and lunch, and watching her two older grandchildren when they get home from school. (*Id.*, Tr. 57–58, PAGEID #: 96–97). She stated that she and her grandson will sit and watch cartoons, and he plays with action figures with her on the couch. (*Id.*, Tr. 57, PAGEID #: 96). Plaintiff testified that when she is at her daughter's house, she has to go up and down the stairs several times a day, but she is "crawling up them by the end of the night." (*Id.*, Tr. 43–44, PAGEID #: 82–83).

When asked the number one reason she was unable to work, Plaintiff stated "I would have to say my neck and my hand, my right hand[.]" (*Id.*, Tr. 51, PAGEID #: 90). Plaintiff

elaborated about her neck pain: "It's a constant pain, constant, just severe chronic pain. Even on my medications, I'm, my neck, I'm always in pain. I use Bengay and that tends to be for the temporary time, the only thing that really subsides it." (*Id.*). With pain medication, Plaintiff states her pain on a daily basis is a four or five on a scale of one to ten. (*Id.*, Tr. 52, PAGEID #: 91).

In terms of her right hand and wrist pain, Plaintiff stated "I didn't even know I had carpal tunnel until Dr. [Paul] Pritchett told me I did because it never really affected me until like the last couple of years." (*Id.*). As a result of her pain, Plaintiff testified that she has "very shaken hand writing" and tries to eat foods that are soft so she won't have to use a knife. (*Id.*, Tr. 52–53, PAGEID #: 91–92). However, Plaintiff is able to button her pants and zip up a jacket. (*Id.*, Tr. 53, PAGEID #: 92).

Plaintiff also testified that she has hip pain. (*Id.*, Tr. 51, PAGEID #: 90). More specifically, Plaintiff explained that her pain feels "like a constant, just like a dagger going into the bone. . . . It's just like a constant, like a knife digging in my hip bone and it just won't go away." (*Id.*). Plaintiff rated her hip pain with medications at a six or seven out of ten. (*Id.*).

When asked if there were any other impairments that affected her ability to work, Plaintiff stated that her "memory's not like it used to be." (*Id.*, Tr. 53, PAGEID #: 92). Further, she testified that she cannot "stay focused very long on the same thing" and doesn't think she is able to follow instructions. (*Id.*, Tr. 56, PAGEID #: 95). Plaintiff testified that she could not do simple math like add, subtract, and make change "like [she] used to." (Doc. 6-2, Tr. 44, PAGEID #: 83). Plaintiff explained that her boyfriend manages her finances and pays her bills because she cannot stay focused. (*Id.*, Tr. 45–46, PAGEID #: 84–85).

As for daily activities, Plaintiff stated that she is tired all the time and "can't really do much with [her] grandkids like [she] used to." (*Id.*, Tr. 54, PAGEID #: 93). The ALJ asked Plaintiff about various functional limitations:

Q: How long can you sit?

A: It, like right in, this is the longest I've ever sat. I'm up and down every three, two, three, four minutes.

Q: And then how long are you up for before you can sit down again?

***

A: I can usually wash a few dishes or I'll try to like maybe stand and fold a few clothes because it actually takes the pain off the hip. And then I can sit back down for about maybe like, about ten minutes.

(*Id.*).

Plaintiff also testified that she can walk to a friend's house for coffee—approximately ten minutes—and lift five to ten pounds. (*Id.*, Tr. 55, PAGEID #: 94). Further, Plaintiff stated that she cannot stoop, kneel, crouch, or crawl; she cannot reach overhead; she cannot tie her shoes; she cannot do her hair; and she cannot dress herself without difficulty. (*Id.*). When the ALJ asked Plaintiff to describe a typical day, Plaintiff responded that she "star[es] out the window." (*Id.*, Tr. 58, PAGEID #: 97).

During questioning by her attorney, Plaintiff discussed various other psychological difficulties. First, Plaintiff discussed her bipolar disorder and stated "[i]t makes me very mean." (*Id.*, Tr. 59, PAGEID #: 98). Plaintiff elaborated that she is "either crying terribly and extremely depressed, or [she is] like a rattlesnake, and I don't like to be that way because I'm mean to the ones that I love." (*Id.*). Plaintiff testified, however, that since she began taking Seroquel eight or nine months prior, she has "been doing very well" and it has kept her "demons at bay." (*Id.*).

Second, Plaintiff stated she has difficulty interacting with others. (*Id.*, Tr. 60, PAGEID #: 99). Finally, Plaintiff described her anxiety attacks: "It's like it, I start getting hot flashes. My chest gets real tight. I can't breathe." (*Id.*). Plaintiff testified that she "started taking a lot of stress out of [her] life" so the attacks have been occurring less frequently. (*Id.*, Tr. 60–61, PAGEID #: 99–100).

### 2. Vocational Expert's Testimony

At the hearing, the ALJ asked vocational expert William Reed ("the VE") several hypothetical questions.

> All right, would you assume a hypothetical individual of the Claimant's age and education . . . Further assume the individual is limited to, I'm going to begin a light exertional category, light as defined in the regulations. So we're talking about occasionally lifting 20 pounds, frequently 10, occasionally carry 20 pounds, frequently 10. Sit, stand and walk up to six hours each and push and pull as much as similar to carry. Occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, occasional vibration, occasional overhead reaching, limited to perform simple routine and repetitive tasks, limited to simple work-related decisions, limited to tolerating few changes in a routine work setting defined as performing the same duties at the same station or location day to day, and occasional and superficial contact with supervisors, coworkers and the public.

(*Id.*, Tr. 64–65, PAGEID #: 103–04). The VE testified that with these limitations, the hypothetical individual could work as a housekeeping cleaner, merchandize marker, or a routing clerk. (*Id.*, Tr. 65, PAGEID #: 104).

The ALJ then changed the hypothetical scenario, adding that the individual could perform frequent handling and fingering on the right side and "would need to have the ability to change positions a maximum frequency of every 30 minutes." (*Id.*, Tr. 65–66, PAGEID #: 104–05). This, according to the VE, would eliminate the housekeeping cleaner, but that individual could work as a photocopying machine operator, in addition to the previous jobs mentioned.

(*Id.*, Tr. 66–67, PAGEID #: 105–06).

Finally, the ALJ reduced the hypothetical individual to sedentary work as defined in the regulations, but kept all of the limitations from the previous two hypothetical scenarios, and asked if there would be any work that individual could perform. (*Id.*, Tr. 67, PAGEID #: 106). The VE explained that an individual with those limitations could work as a surveillance-system monitor, an order clerk, and an addresser. (*Id.*). The ALJ asked the maximum frequency this hypothetical individual would be able to change positions from standing to sitting and remain on task. (*Id.*). The VE testified that in all three jobs a worker would be able to change positions very frequently (later clarified as every ten to fifteen minutes) and still be productive. (*Id.*, Tr. 67–68, PAGEID #: 106–07). Indeed, the VE further elaborated that a surveillance-system monitor could change positions every five minutes without interfering with productivity. (*Id.*, Tr. 69, PAGEID #: 108).

### C. Relevant Medical Background

On May 22, 2014, Plaintiff underwent a cervical spine MRI at the request of her treating physician, Dr. Paul Pritchett. (Doc. 6-7, Tr. 485, PAGEID #: 529). The MRI showed minimal reversal of the normal cervical lordosis, minimal retrolisthesis of C5 over C6, and minimal anterolisthesis of C7 over T1. (*Id.*). Further, there were mild to moderate multilevel degenerative changes noted. (*Id.*).

Plaintiff saw Dr. Nalin Mathur on September 29, 2014, for a consultative examination. (Doc. 6-7, Tr. 489, PAGEID #: 533). Dr. Mathur noted that Plaintiff had a past history of chronic pain syndrome in the neck and lower back, cervical spondylosis, degenerative disc disease in the low back, and brachial neuropathy. (*Id.*). Plaintiff reported at the appointment that

she is in chronic pain all day long, cannot walk more than a couple of blocks, and cannot lift more than 20 to 30 pounds. (*Id.*). A physical examination showed Plaintiff could extend her hand fully, make a fist, oppose fingers, and her grip strength was 5/5. (*Id.*, Tr. 490, PAGEID #: 534). Dr. Mathur noted, however, that Plaintiff had a positive straight leg test on her right side and was tender bilaterally in the cervical region, as well as the lumbar region. (*Id.*). Ultimately, Dr. Mathur opined that he did not believe Plaintiff could "do more than a few minutes of sitting, standing, walking, lifting, [and] carrying any objects." (*Id.*). He noted that Plaintiff appeared to be in a lot of pain on her left side and she may benefit from an ambulatory aid. (*Id.*, Tr. 490–91, PAGEID #: 534–35). Dr. Mathur also stated that Plaintiff was able to hear and understand normal conversation. (*Id.*, Tr. 491, PAGEID #: 535).

On November 20, 2014, state agency consultant Dr. M. Lowen opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, could stand and/or walk 6 hours in an 8-hour workday, could sit (with normal breaks) for 6 hours in a workday, and had various other postural limitations. (Doc. 6-3, Tr. 81–82, PAGEID #: 121–22). Ultimately, Dr. Lowen opined that Plaintiff was capable of light exertional work and was not disabled. (*Id.*, Tr. 85–86, PAGEID #: 125–26). Dr. S.K. Najar, also a state agency consultant, affirmed Dr. Thomas's assessment on April 28, 2015. (*Id.*, Tr. 113–14, 117, PAGEID #: 153–54, 158).

A cervical spine radiography on September 7, 2016, showed findings suggesting muscle spasm and some degenerative changes. (Doc. 6-9, Tr. 872, PAGEID #: 958). There were, however, no acute osseous abnormalities present. (*Id.*).

On February 8, 2017, Dr. Paul E. Pritchett completed a Disability Impairment

Questionnaire. (Doc. 6-9, Tr. 910, PAGEID #: 956). Dr. Pritchett noted that he began treating Plaintiff in August 2013, and sees her monthly. (*Id.*). Dr. Pritchett listed the following diagnoses: "severe chronic pain, unable to keep up with hygiene, sex is very painful, left hip needs to be replaced, severe degeneration in neck and spine, arthritis, burcitis [sic] left hip, carpal tunnel right, osteoporosis, osteopenia, osteosticulosis [sic] right ear implant." (*Id.*). Dr. Pritchett stated that household chores, sitting, laying, walking, driving, playing with grandchildren, and grocery shopping, *inter alia*, were factors that aggravate Plaintiff's pain. (*Id.*, Tr. 911, PAGEID #: 957). In terms of limitations during an eight-hour workday, Dr. Pritchett opined that Plaintiff could perform a job in a seated position for less than 1 hour and could perform a job standing and/or walking for less than 1 hour. (*Id.*, Tr. 912, PAGEID #: 958). Further, Dr. Pritchett stated that Plaintiff would need to elevate her left leg to waist level while sitting, whenever she had pain. (*Id.*). Dr. Pritchett also checked the box that Plaintiff could never lift or carry 5–10 pounds, but also checked the box that she could occasionally lift or carry 5–10 pounds. (*Id.*).

Additionally, Dr. Pritchett opined that Plaintiff could never/rarely grasp, turn and twist objects; use hand/fingers for fine manipulations; or use arms for reaching (including overhead). (*Id.*, Tr. 913, PAGEID #: 959). Dr. Pritchett also checked the box that Plaintiff would need to take unscheduled breaks to rest at unpredictable intervals during an 8-hour workday. (*Id.*). The Questionnaire asked "how often do you think this will happen?" and "how long will your patient have to rest before returning to work?" (*Id.*). Instead of answering those questions, Dr. Pritchett wrote that Plaintiff "has not worked in 3½ years" and that she is "unable to do gainful employment." (*Id.*). Finally, Dr. Pritchett noted that Plaintiff "has bipolar manic depressive, and

memory loss on right side." (*Id.*, Tr. 914, PAGEID #: 960).

### D. The ALJ's Decision

The ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease, unspecified arthropathies (hallux valgus deformity, osteoporosis); bipolar disorder, and anxiety. (Doc. 6-2, Tr. 14, PAGEID #: 53). Despite these impairments, the ALJ held that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. (*Id.*, Tr. 16, PAGEID #: 55). Specifically, the ALJ held that Plaintiff did not meet Listing 1.04 (disorders of the spine), because the record did not demonstrate compromise of a nerve root with the required additional findings. (*Id.*). Further, the ALJ found that Plaintiff's mental impairments did not meet Listing 12.04 or 12.06, because Plaintiff had only a moderate limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation with regard to concentration, persistence, and pace; and mild limitation for adapting or managing oneself. (*Id.*, Tr. 16–17, PAGEID #: 55–56).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ stated:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can lift and/or carry ten pounds occasionally and less than ten pounds frequently; can sit for six hours in an eight-hour workday and stand and/or walk two hours in an eight-hour workday. She can push and/or pull as much as she can lift and/or carry. The claimant can climb ramps and stairs occasionally and should never climb ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. The claimant can have occasional exposure to vibration. The claimant would need to change positions a maximum frequency of every thirty minutes. The claimant retains the ability to understand, remember and carry out simple routine and repetitive tasks; can use judgment limited to simple work-related decisions; can tolerate few changes in a routine work setting defined as performing the same duties at the same duty station or locations from day to day. The claimant is limited to occasional and superficial contact with supervisors, co-workers and the public.

(*Id.*, Tr. 18, PAGEID #: 57).

In terms of the weight given to the various physicians, the ALJ expressly stated that she considered the following specific factors: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, and (5) specialization. (*Id.*, Tr. 22, PAGEID #: 61). The ALJ assigned "partial weight" to state agency consultants Dr. Lowen and Dr. Najar. (*Id.*, Tr. 23, PAGEID #: 62). In doing so, the ALJ noted that the two physicians have specialized program knowledge and their opinions were consistent with the evidence at the time they were rendered. (*Id.*). The ALJ acknowledged, however, that because evidence received at the treatment level suggests that Plaintiff is now more limited, the opinions should be assigned only partial weight. (*Id.*).

Next, the ALJ assigned "little weight" to Dr. Mathur, who found Plaintiff "could do [no] more than a few minutes of sitting, standing, walking, lifting, and carrying any objects." (*Id.*). The ALJ explained her decision to assign only little weight:

> The opinion is not stated in vocationally significant terms. The opinion does not discuss any postural limitations, nor does it specify the length of time she could sit, stand, walk, lift, and carry. The opinion was made after one examination and is inconsistent with the longitudinal medical evidence of record. In October 2016, the claimant had full range of motion in the upper and lower extremities. She had normal muscle strength and tone (Ex. 10F-4). Further, the opinion is inconsistent with the claimant's actual activities of daily living. The claimant reported that she was able to shop in the grocery store and use public transportation (Ex. 7E-5). These activities require a certain amount of sitting, walking and standing. The claimant testified that she frequently walked ten minutes to have coffee with a friend. The claimant further testified that she was responsible for bathing and taking care of a four-year old child. At the examination, she stated that she could not walk more than a couple blocks and could not lift more than 20–30 pounds, which is the weight of her granddaughter (Ex. 5F-1). The claimant was reportedly more active than the limitations imposed by this physician. Therefore, this opinion is given little weight.

(*Id.*).

The ALJ also assigned "little weight" to Dr. Pritchett, explaining that his opinion was inconsistent with his examination and treatment notes:

> Treatment notes indicated that she had full range of motion of her upper and lower extremities, normal muscle strength and tone. She had a normal neurological examination. Her memory was found to be intact and she was noted not to be depressed, anxious or agitated (Ex. 8F-20, 53, 56, 59, 63; 10F-5; 13F-3, 7). The opinion as to claimant's ability to use her hands is not consistent with the medical evidence. The claimant had grip strength of 5/5 upon consultative examination (Ex 5F). X-rays of the left wrist were normal (Ex 9F-3, 4). The claimant testified that she could eat with utensils, button, zip, hold a cigarette, and use a fork. . . . The MRI of the cervical spine showed minimal findings (Ex 4F-2). Therefore, this opinion is given little weight.

(*Id.*, Tr. 24, PAGEID #: 63).

Finally, the ALJ held that although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the record. (*Id.*, Tr. 25, PAGEID #: 64). The ALJ elaborated on how she reached that finding:

> First, the description of the claimant's symptoms and limitations the claimant provided throughout the record were inconsistent with the objective findings. The claimant had normal to mild findings throughout the treatment record. The primary treating physician who prescribed pain medications had normal physical and mental examinations throughout the treatment record (Ex. 8F-20, 53, 56, 59, 52; 10F-5, 13F-3, 7). Third, [sic] the level of treatment and care is inconsistent with the severity of the claimant's allegations. The claimant has not required frequent emergency intervention. The claimant showed improvement with conservative management of the impairments, to include prescription medication. She reported that she regretting [sic] not getting treatment sooner because the medications were somewhat effective (Ex. 11F-20). Fourth . . . the claimant's subjective complaints were not corroborated by objective evidence, to include digital imaging and physical examinations. The MRI of the cervical spine were minimal findings or retrolisthesis and anteriolisthesis (Ex. 4F-2). . . . Finally, claimant's activities of daily living are inconsistent with the intensity and limiting effects of the symptoms alleged. The claimant cared full time for three grandchildren and reported that she could not walk more than a couple of blocks and could not lift more than 20–30 pounds, which is the weight of her granddaughter (Ex. 5f-1). While the claimant has some functional limitations set

forth in the above residual functional capacity, the treatment notes throughout the medical record do not support the extent of severity alleged by the claimant. The residual functional capacity above adequately compensates for the severity of the claimant's impairments as supported by the treatment record.

(*Id.*).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III.    DISCUSSION

Plaintiff asserts three assignments of error:  (1) the ALJ failed to weigh the medical opinion evidence properly; (2) the ALJ improperly evaluated Plaintiff's testimony; and (3) the ALJ relied on a flawed hypothetical question to the VE.  (*See generally* Doc. 7).

### A.  Weighing the Medical Evidence

Here, Plaintiff challenges the ALJ's decision to assign treating physician Dr. Pritchett less than controlling weight.  (*Id.* at 11–17).  In so arguing, Plaintiff also expresses disagreement

with the ALJ's decision to grant more weight to the state agency consultants, while also assigning Dr. Mathur's opinion—which she contends was consistent with Dr. Pritchett—little weight. (*Id.* at 15 ("There is no authority that permits an ALJ to give greater weight to opinions from non-treating, non-examining sources who review a markedly undeveloped record and are not specialists in relevant areas of medicine over the well-supported opinions from a treating doctor.")). Finally, Plaintiff argues that the "ALJ appears to be substituting her own opinion of disability for both the Commissioner's Regulations and the medical evidence." (*Id.* at 14).

As an initial matter, "[i]t is the Commissioner's function to resolve conflicts in the medical evidence[.]" *Ray v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 718, 727 (S.D. Ohio 2013) (citing *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir. 1987)). Accordingly, when medical sources rely on the same evidence and reach different conclusions, it is the ALJ's job to resolve the inconsistency. *See, e.g., Goodson v. Chater*, No. 95-6582, 1996 WL 338663, at *1 (6th Cir. June 17, 1996). With this standard in mind, the undersigned turns to the physicians' opinions.

### 1. Dr. Pritchett

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting

20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); 20 C.F.R. § 404.1527(c)(2). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, the ALJ explained that Dr. Pritchett's opinion was given little weight because it was found to be inconsistent with the examination and treatment notes. (Doc. 6-2, Tr. 24, PAGEID #: 63). Specifically, the ALJ noted that the May 2014 MRI of Plaintiff's cervical spine showed minimal findings (*id.* (citing Ex. 4F-2)), as did the September 2016 cervical spine radiograph. Further, Dr. Pritchett opined that Plaintiff could never/rarely "grasp, turn and twist objects, use hands/finger for fine manipulations; or use arms for reaching" (Doc. 6-9, Tr. 913, PAGEID #: 959), yet treatment notes show Plaintiff had normal grip strength, and she was able to button and zip her clothing, hold a cigarette, and hold a fork. Thus, Plaintiff admitted to abilities that contradict Dr. Pritchett's assessment.

Finally, The ALJ found that Dr. Pritchett's own notes were indicative of normal findings. (Doc. 6-2, Tr. 25, PAGEID #: 64; *see also, e.g.*, Doc. 6-8, Tr. 531, PAGEID #: 576 (January 12, 2016 treatment notes finding "full range of motion of the upper and lower extremities" and "normal muscle strength and tone"); *id.*, Tr. 619, PAGEID #: 664 (October 27, 2014 treatment notes finding "full range of motion of the upper and lower extremities" and "normal muscle strength and tone"); *id.*, Tr. 564, PAGEID #: 609 (April 7, 2014 treatment notes finding "full

range of motion of the upper and lower extremities" and "normal muscle strength and tone")).

Plaintiff counters that as a "layperson" the ALJ was not qualified to determine what findings were indicative as "normal." (*See generally* Docs. 7, 9). But it was Dr. Pritchett who classified the examination findings as "normal" in his treatment notes, not the ALJ. Finally, Plaintiff avers that the ALJ cherry-picked normal findings, while ignoring other abnormalities identified by Dr. Pritchett. (Doc. 9 at 2). While the undersigned disagrees with that characterization, it is important to note that "the *legal* determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 578 (W.D. Mich. 2008) (emphasis in original) (citing *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 804 (6th Cir. 2008)).

Thus, although Plaintiff may disagree with the ALJ's ultimate conclusion, the ALJ's decision to grant little weight to Dr. Pritchett's opinion was consistent with the Social Security Regulations. Further, the ALJ's explanation provided sufficient detail to satisfy the good-reasons requirement and appropriately explained the disposition of the case to Plaintiff. *See Henderson v. Astrue*, No. 10-CV-238-JMH, 2011 WL 3608164, at *3 (E.D. Ky. Aug. 16, 2011) (Good reasons include, *inter alia*, "a treating physician's opinion that contradicts other medical evidence in the record[] and a treating physician's opinion that contradicts other opinions of the same treating physician already in the record"); *see also Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (An ALJ has no requirement to provide "an exhaustive factor-by-factor analysis" in order to satisfy the good reasons requirement.). It was therefore not an error for the ALJ to assign Dr. Pritchett's opinion little weight.

### 2. Dr. Mathur and State Agency Consultants

Pursuant to the Social Security regulations, the ALJ is required to evaluate every medical opinion and consider a variety of non-exhaustive factors in deciding what weight to assign. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)). Here, Plaintiff argues that the ALJ erred in failing to give Dr. Mathur's opinion more weight and by giving the state agency consultants too much weight.

At bottom, the state agency consultants, Dr. Mathur, and Dr. Pritchett provided opinions that were inconsistent. That the ALJ resolved these inconsistencies in a manner unfavorable to Plaintiff does not mean the ALJ ignored evidence, or that her ultimate conclusion was not supported by substantial evidence. Indeed, the ALJ stated explictly that she gave Dr. Mathur's opinion little weight because the opinion was not stated in vocationally significant terms, did not discuss any postural limitations, and the opined length of time for sitting, standing, and walking was not clear. (Doc. 6-2, Tr. 23, PAGEID #: 62). Plaintiff concedes that Dr. Mathur's opinion is somewhat vague, but she argues it is consistent with Dr. Pritchett. But Plaintiff fails to acknowledge important discrepancies between the two opinions. For example, Plaintiff told Dr. Mathur she could lift up to 30 pounds (Doc. 6-7, Tr. 489, PAGEID #: 533), yet Dr. Pritchett checked the boxes that Plaintiff could never or rarely lift or carry 5–10 pounds (Doc. 6-9, Tr. 912, PAGEID #: 958).

As to the state agency consultants, despite Plaintiff's characterization, they are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (citations omitted). And in some cases, it may be appropriate for an ALJ to

assign greater weight to a state agency consultant's opinion than to that of a treating or examining source. *See Molebash v. Berryhill*, No. 2:16-CV-869, 2017 WL 3473816, at *4 (S.D. Ohio Aug. 14, 2017), *adopted sub nom. Molebash v. Comm'r of Soc. Sec.*, No. 2:16-CV-869, 2017 WL 3769353 (S.D. Ohio Aug. 29, 2017). Here, the ALJ explained that the state agency consultants had specialized program knowledge, but she also conceded that evidence after the time the opinions were issued "suggest that the claimant is more limited." (Doc. 6-2, Tr. 23, PAGEID #: 62). Accordingly, the ALJ's decision to assign their opinions only "partial weight" was supported by substantial evidence.

Ultimately, even if the undersigned were to agree that Dr. Mathur's opinion could have been given more weight and the state agency consultant's opinions could have been given less weight, the ALJ's decision may not be reversed simply because record evidence supports a different conclusion. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1996). Instead, it is the ALJ's "function to resolve conflicts in the evidence, *see Hardaway v. Sec of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987)," which is what the ALJ did, while providing explicit rationales for the conclusions she reached. Thus, the weight accorded by the ALJ to various physicians was supported by substantial evidence.

### B. Credibility Determination

Plaintiff next argues that substantial evidence does not support the ALJ's "credibility" determination, pursuant to SSR 16-3p, 2016 WL 1119029. (Doc. 7 at 18–21). Recently enacted, SSR 16-3p eliminated the use of the term "credibility" in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." Instead, the regulation directs the ALJ to consider whether the claimant's statements about the intensity, persistence,

and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record.  2016 WL 1119029 at *7.

Here, the ALJ stated explictly that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the record and listed her reasons for so finding:  (1) Plaintiff's description of her symptoms were inconsistent with objective findings; (2) the level of treatment and care was inconsistent with the severity of Plaintiff's allegations; (3) Plaintiff's subjective complaints were not corroborated by digital imaging and physical examinations; and (4) Plaintiff's daily activities were inconsistent with the intensity and limiting effects of the alleged symptoms.  (Doc. 6-2, Tr. 25, PAGEID #: 64). Plaintiff argues that the ALJ erred, at least in some way, by relying on each of these factors. (Doc. 7 at 19–21).

Despite Plaintiff's arguments, the ALJ's credibility finding was based on a variety of permissible factors, with no one factor being determinative.  For example, the ALJ noted Plaintiff had normal to mild findings throughout the treatment record and cited to the various treatment notes of Dr. Pritchett that reflected normal range of motion and strength.  (Doc. 6-2, Tr. 25, PAGEID #: 64).  Additionally, as noted above, the MRI and imaging of Plaintiff's spine demonstrated mild findings.  Further, courts have held consistently that conservative treatment is a permissible factor to consider when evaluating a plaintiff's complaints.  *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 638 (6th Cir. 2016) (holding that it was proper for ALJ to discount Plaintiff's credibility due, in part, to "conservative treatment for the allegedly disabling impairments"); *Kendrick v. Astrue*, 886 F. Supp. 2d 627, 638 (S.D. Ohio 2012) (relying on the fact that Plaintiff had received "only conservative treatment" in finding that Plaintiff's credibility

was undermined); *McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 WL 687680, at *4 (6th Cir. May 19, 2000) ("Plaintiff's complaints of disabling pain are undermined by his non aggressive treatment."). Here, the ALJ noted that Plaintiff testified to conservative management of her symptoms, and there was no documentation of any emergency intervention. (Doc. 6-2, Tr. 25, PAGEID #: 64).

Additionally, Plaintiff testified that upon starting Seroquel she had been "doing very well" and that Bengay seemed to improve her neck pain. This type of improvement in symptomology is permissible for an ALJ to consider. *See, e.g.*, *Dempley v. Astrue*, No. CIV.A.309CV651, 2010 WL 1979404, at *3 (W.D. Ky. May 14, 2010) (holding that an ALJ's credibility determination was supported by substantial evidence when the ALJ considered, *inter alia*, improvement in a plaintiff's symptoms). Finally, Plaintiff states that there is no evidence she engaged in any activities for sustained periods of time that contradict her allegations that she cannot work a full-time job for 8 hours a day, 40 hours a week. (Doc. 7 at 20–21). However, as the ALJ noted, Plaintiff was the primary caretaker of her three grandchildren until recently, and she still continues to be responsible for the care of her four-year old grandson—including feeding and entertaining him. (Doc. 6-2, Tr. 19, PAGEID #: 58). Relatedly, Plaintiff stated that she and her grandson sit downstairs and watch cartoons together, yet she also claimed she could only sit for two to four minutes at a time. Likewise, although Plaintiff alleged severe postural limitations, she testified that she goes up and down the stairs at her daughter's home multiple times a day and is able to walk ten minutes to meet her friend. Thus, Plaintiff's reported activities are inconsistent with the alleged limiting effects of her impairments.

In this case, the ALJ set forth the various factors that she considered in her credibility assessment—including specific citations to medical records, objective clinical findings, Plaintiff's treatment regimen, and her daily activities—and properly relined on these factors. (*See* Doc. 6-2, Tr. 25, PAGEID #: 64). Consequently, the ALJ complied with the regulations, and her credibility determination is supported by substantial evidence. And it is not the province of the reviewing court to "try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *see also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints.").

## C. Hypothetical Question to the VE

In her final statement of error, Plaintiff argues that the ALJ relied on a flawed hypothetical question to the vocational expert:

> [T]he ALJ found [Plaintiff] has moderate limitations understanding, remembering, and applying information; moderate limitations interacting with others; and moderate limitations concentrating, persisting, and maintaining pace (Tr. 16–17). However, she failed to adequately account for all these limitations in the accepted hypothetical question to the VE. Instead, the accepted hypothetical to the VE only restricted [Plaintiff] mentally to simple work-related decisions; tolerating few changes in a routine work setting, defined as performing the same duties at the same station or location day to day; and, no more than occasional and superficial contact with supervisors, co-workers, and the public (Tr. 64–65).

(Doc. 7 at 21).

In order for a vocational expert's testimony to serve as substantial evidence in support of the conclusion that a plaintiff can perform other work, the hypothetical question posed by the ALJ must accurately portray all physical and mental impairments. *See Howard v. Comm'r of*

*Soc. Sec.*, 276 F.3d at 239, 241 (6th Cir. 2002). Here, Plaintiff's argument fails to acknowledge that the last hypothetical posed to the VE (the one the ALJ ultimately relied upon), included all of the mental restrictions ultimately found in Plaintiff's RFC. Thus, the hypothetical accurately described Plaintiff's restrictions in all significant aspects. (Doc. 7 at 21). It appears then, as the Commissioner notes, that Plaintiff's argument is really one in which she disagrees with the opined mental limitations in the RFC, as opposed to a flawed question to the VE.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe*, 342 F. App'x at 155; *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). It is the ALJ, not a physician, who ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC."). Indeed, "[a]n RFC determination is a legal decision rather than a medical one, and the development of a claimant's RFC is solely within the province of an ALJ." 20 C.F.R. §§ 404.1527(e), 405.1546.

Here, the ALJ noted that Plaintiff had moderate limitation in understanding, remembering, or applying information, as she is able to count change but cannot pay bills or handle a savings account. (Doc. 6-2, Tr. 16–17, PAGEID #: 55–56). Further, the ALJ opined that Plaintiff had moderate limitation in concentration, persistence, and pace, noting that Plaintiff is able to handle some changes in routine, but is unable to finish conversations, chores, or watching a movie. (*Id.*, Tr. 17, PAGEID #: 56 (citing Ex. 7E-7)). The fashioned RFC properly takes these limitations into account, as it states Plaintiff is limited to simple, routine, repetitive tasks, she is to use judgment limited to simple work-related decisions, and can tolerate only few changes in a

routine work setting (*id.*, Tr. 18, PAGEID #: 57). *See Gipson v. Comm'r of Soc. Sec.*, No. 5:16 CV 1108, 2017 WL 3732009, at *12 (N.D. Ohio Aug. 30, 2017) (holding that the ALJ's RFC limiting Plaintiff to simple, routine, repetitive tasks, requiring only simple work related decisions, complied with the moderate limitations the agency psychiatrists placed on Plaintiff's abilities in concentration and pace.").

Additionally, the ALJ held that Plaintiff had moderate limitation in interacting with others and mild limitation in adapting or managing oneself. (Doc. 6-2, Tr. 17, PAGEID #: 56). Again, the RFC was consistent with these findings, as it limited Plaintiff to occasional and superficial contact with supervisors, co-workers, and the public. (*Id.*, Tr. 18, PAGEID #: 57).

Thus, although Plaintiff is seemingly arguing for a more restrictive RFC with additional mental limitations, it was within the ALJ's purview to make a determination about Plaintiff's RFC based on the record as a whole. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (noting that "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference"). Taking all of the above into account, the undersigned finds that substantial evidence supports the ALJ conclusions.

## IV.    CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 7) be **OVERRULED** and that judgment be entered in favor of Defendant.

## <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with

supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

   IT IS SO ORDERED.


Date: April 10, 2018        <u>/s/ Kimberly A. Jolson</u>
               KIMBERLY A. JOLSON
               UNITED STATES MAGISTRATE JUDGE